**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CORNELL HERBERT )<br>)<br>Plaintiff )<br>)<br>v )<br>)<br>ARCHITECT OF THE CAPITOL )<br>)<br>Defendant ) | 1:09-cv-1719 (CKK) |

## SECOND AMENDED COMPLAINT

Now Comes Plaintiff, Cornell Herbert, by and through his undersigned counsel, and states as follows for his Complaint against the Defendant Architect of the Capitol:

### JURISDICTION

1. Plaintiff invokes the jurisdiction of this Court pursuant to The Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

2. This is an action authorized and instituted pursuant to The Congressional Accountability Act, (2 U.S.C. 1301 *et seq*.), Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. sections 2000e, *et seq*.), and the common law.

3. The unlawful employment practices alleged in this Complaint were committed in the District of Columbia.

4. The Plaintiff is African American and a resident of the State of Maryland.

5. The Defendant, the Plaintiff's current employer, is a United States Congressional Agency located in the District of Columbia.

6. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of

this action. The Plaintiff filed timely Requests for Counseling before the Office of Compliance raising the violations of the Congressional Accountability Act complained of here.  The Plaintiff participated in the Office of Compliance Counseling and Mediation sessions with respect to the matters raised here; and the Plaintiff files this Complaint after the expiration of 30 days, and before the expiration of 90-days, following the receipt of the notice of the termination of mediation issued by the Office of Compliance.

## BACKGROUND FACTS

7. Mr. Herbert reasserts and reavers each of the above paragraphs as if they were specifically restated here.

8. In the fall of 2005, Mr. Herbert initiated a complaint of race-based discrimination with the Office of Compliance. Mr. Herbert's claim included allegations that he was denied training and the opportunity to perform skilled painting tasks that would support his promotion from Grade 7 to Grade 9, that he was denied promotions and performance awards and that he was subjected to informal discipline that should have been directed at his White colleagues instead of him.

9. Mr. Herbert's co-workers additionally told racially charged stories and jokes regularly and often in his presence.  When Mr. Herbert brought these issues to Paint Branch Supervisor, Ed Williams' attention, Mr. Williams failed to take any disciplinary action and, instead, asked Mr. Herbert to accept the apology of the person(s) who had told the joke or story.

10. Prior to initiating his complaint at the Office of Compliance, on or about August 31, 2005, Mr. Herbert discussed his concerns with the Paint Branch Supervisor, Ed

Williams, and Deputy Superintendent of the House Office Buildings, Bob Gliech.

11. Following this meeting, in which Messrs. Williams and Gliech failed to address Mr. Herbert's concerns, Mr. Herbert advised Mr. Williams that he would proceed to file a complaint at the Office of Compliance. Mr. Williams responded by asking Mr. Herbert if he was concerned about losing his job as a result of making such a complaint.

12. Mr. Herbert filed his complaint with the Office of Compliance on or about August 31, 2005. Shortly thereafter, a sticker that read "WARNING," was placed on his locker. When Mr. Herbert brought the sticker to Mr. Williams' attention, Mr. Williams responded that Mr. Herbert "must have pissed someone off."

13. Mr. Herbert nevertheless filed his complaint with the Office of Compliance.

14. Unbeknownst to Mr. Herbert, during the summer of 2006 - before the Office of Compliance complaint was resolved - Mr. Williams determined that Mr. Herbert deserved to be promoted to a Grade 9 Painter.

15. In resolution of his complaint before the Office of Compliance, Mr. Herbert was promised a promotion to the Grade 9, but – at Mr. Williams' insistence – the promotion was not to be effective until the end of January 2007.

16. The delay in promoting Mr. Herbert until January 2007 was motivated out of racial and/or retaliatory animus. Mr. Williams delayed promoting Mr. Herbert for approximately six months because of Mr. Herbert's protected activity.

17. In the Fall of 2006 a temporary painter working in the Paint Shop made a threat of violence against Mr. Herbert. The employee specifically threatened to beat Mr. Herbert up when "his boys" were present.

18. Mr. Herbert brought this threat to the attention of Shop Supervisor Ed Williams. When Mr. Williams took no concrete action with regard to the threat, Mr. Herbert called the Capitol Police. The Capitol Police indicated that they would take no further action if Mr. Herbert and the temporary painter agreed to set aside their differences. Mr. Williams took no disciplinary action against the temporary painter, even though, on information and belief, the AOC has a zero tolerance policy toward threats of violence in the workplace.

19. On December 2, 2006, one of the Defendant's White temporary painters insulted Mr. Herbert and repeatedly called him a "nigger," in the presence of the painters and the Crew Leader. The Leader informed Mr. Williams about the incident, and Mr. Williams pressured Mr. Herbert to let the racial slur be forgotten and to permit the temporary painter to apologize to him. When Mr. Herbert indicated that an apology would not suffice, Mr. Williams sent the temporary painter home. Based on the testimony of Frank Tiscione, who was the Superintendent of the House Office Building at the time, and therefore Mr. Williams third-level supervisor and the person who ultimately had the authority to fire the temporary painter, the White temporary painter was terminated only because Mr. Herbert would not let the matter be forgotten with a mere apology.

20. Night Shift Leader, John Buckler, encountered the temporary painter after he had been ordered to leave the premises. Mr. Buckler understood from his encounter that the temporary painter intended to do Mr. Herbert physical harm; but Mr. Buckler did nothing to ensure that no harm came to Mr. Herbert. Mr. Buckler additionally failed to report the encounter to any supervisory employers.

21. On January 9, 2007, Mr. Williams proposed to officially reprimand Mr. Herbert for 1) failing to perform assigned duties and 2) using inappropriate language in the workplace. This misconduct was alleged to have occurred on December 2, 2006, the date that Mr. Herbert refused to accept the temporary painter's apology. Subsequently, on May 10, 2007, the Defendant – by and though Frank Tiscione (Superintendent of the House Office Buildings) – issued his concurrence of the decision to reprimand Mr. Herbert. On or about June 18, 2007, the Defendant – by and through Stephen Ayers (the Acting Architect of the Capitol) – upheld the issuance of the Reprimand and the Letter of Reprimand was formally issued to the Plaintiff. The reprimand remained in Mr. Herbert's Official Personnel Folder for approximately one year.

22. In late December 2006 or early January 2007, then Assistant Superintendent of the Architect of the Capitol, Robert Gleich, informed Tonda Cave, a Senior Human Resources Specialist who typically handled disciplinary actions, that there was a "troublemaker" in the Paint Shop and that an investigation should be launched with a stated goal of intimidating the "troublemaker" into ceasing his allegedly "disruptive" activities. The alleged troublemaking was found to be Mr. Herbert. His "troublemaking" was his formal and informal complaints of discrimination and retaliation.

23. Ms. Cave conducted the investigation primarily in January 2007 by interviewing the majority of Mr. Herbert's colleagues. The notes from the investigation reveal that many of Mr. Herbert's colleagues believed that assignments and promotions were doled out in a discriminatory and/or retaliatory fashion in the Paint Shop. Ms. Cave

reported to Mr. Gleich and Deputy Assistant Superintendant William Wood that Mr. Herbert was the identified troublemaker and that his informal and formal protected EEO activity was "disruptive" to the Shop. Ms. Cave also accused Mr. Herbert of attempting to provoke discriminatory and/or retaliatory behavior as a means of getting money from the AOC, but she never reported the employees' concerns about the discriminatory terms and conditions in the Paint Shop including, but not limited to, the manner in which assignments and promotions were made.

24. On or about November 12, 2008, Mr. Herbert learned that he was not selected to act as one of the appointed "Point Men" who act as crew leaders for the numerous full time and temporary painters who work together during what are known as "the Congressional Moves" to prepare all new House of Representatives offices following the bi-annual Congressional Elections. Although Assistant Shop Supervisor Charles Bryan indicated that the appointments were made based on seniority, Mr. Herbert was passed over in favor of less senior painters who were not African American and who had never engaged in protected EEO activity.

25. Although his supervisors have acknowledged his skill as a painter and his strong work ethic, Mr. Herbert has been regularly assigned the "dirty jobs" in the shop, including painting the guardrails in the parking garage of the Rayburn building and cleaning tools and brushes. Despite Mr. Herbert's skill and experience as a painter, because of these assignments, Mr. Herbert is sometimes referred to derogatorily as a "painter-helper," a lower-graded position in the paint shop.

26. On March 20, 2009, Mr. Williams angrily and aggressively confronted Mr. Herbert, while Mr. Herbert was half-dressed in the locker room. Because Mr. Williams was

acting wildly and screaming at Mr. Herbert, Mr. Herbert indicated that he was going to discuss Mr. Williams' behavior with a Deputy Assistant Superintendent. Mr. Williams followed Mr. Herbert to the Dep. Asst. Superintendent's office and continued his tirade against him. Mr. Herbert attempted to leave the office to avoid the confrontation, at which time Mr. Williams physically stopped Mr. Herbert from leaving.

27. No action has ever been taken against Mr. Williams to address his unacceptable behavior, which is characteristic of the AOC's failure to discipline employees, other than Mr. Herbert.

28. Since approximately April 2009, Mr. Herbert has not been assigned to work on any desirable assignments (or so called high-profile jobs) including painting House Members' offices. These higher visibility projects are more prestigious and often lead to spot and performance awards.

29. On information and belief, Mr. Williams prompted Mr. Herbert's colleagues to take hostile and harassing actions against him in an attempt to create a hostile environment:

   a. Whenever Mr. Herbert raises a concern or criticism about the workplace, the two Shift Leaders shout him down and loudly accuse him of blowing things out of proportion and attempting to cause trouble in the workplace.

   b. One of Mr. Herbert's colleagues accused him of attempting to harm him when Mr. Herbert tossed him a set of keys.

   c. Two of Mr. Herbert's colleagues (including one of the Shift Leaders) falsely accused Mr. Herbert of sexually harassing women in the workplace. (The AOC's

       Equal Employment Opportunity and Conciliation Program dismissed the complaint out of hand).

   d. Fabricating fictitious offenses and belittling Mr. Herbert's valid concerns is consistent with: 1) a fabricated event that was uncovered in discovery in Mr. Herbert's pending civil action: in that instance, the night shift work leader invented an incident involving Mr. Herbert and wrote a "note to file" that Mr. Herbert threatened to beat him up; and 2) one of the Shift Leader's admission that Mr. Herbert was the only employee in the paint shop on whom he kept a record.

30. On May 5, 2009, Mr. Williams wrongly disciplined Mr. Herbert based on an account from an (unidentified) colleague who falsely claimed that he overheard Mr. Herbert speaking with a Capitol Police officer and telling the officer that Mr. Williams was racist.

31. Mr. Herbert presented his concerns about the aforementioned hostile work environment that he was working under to Assistant Superintendent Bill Wood in a series of letters on August 26 and August 27, 2009.

32. Following the exhaustion of the procedures required by the Congressional Accountability Act, Mr. Herbert filed this civil action on September 9, 2009.

33. On September 22, 2009, Mr. Wood responded to Mr. Herbert by belittling his concerns. He also required Mr. Herbert to speak with the AOC Ombudsman as a condition of his continued employment with the Defendant.

34. Mr. Herbert met with the Ombudsman on November 2009.

35. On information and belief no other management official or coworker was required to undergo a counseling session with the Ombudsman.

36. On May 1, 2010, one of Mr. Herbert's coworkers (one of the coworkers who accused him of sexual harassment) verbally assaulted him and threatened him physically because he was annoyed with the music that Mr. Herbert was playing on his personal radio. Mr. Herbert remained calm during the tirade and the work Leader on duty ordered the coworker to remove himself from Mr. Herbert's presence and informed him that his actions were unacceptable. On May 25, 2010, Shop Supervisor Ed Williams initiated action to discipline Mr. Herbert. On information and belief, the Defendant took no disciplinary action against the employee who had berated and threatened Mr. Herbert.

37. The Superintendent of the House Office Buildings concurred with the letter of reprimand against Mr. Herbert. In the concurrence, the Superintendent claimed that Mr. Herbert had failed to "cooperate and communicate with [his colleagues] in situations involving radio usage to avoid conflicts regarding the volume, selection of stations, or content." This ignores the facts that: (1) the Leader on duty indicated that it is common for employees to play their radios while working; (2) earlier in the day, Mr. Herbert had politely and immediately complied with requests that he turn his radio down and move the radio into the room where he was then painting; and (3) in light of Mr. Herbert's responsiveness earlier in the day, the Leader elected not to entertain any additional complaints about Mr. Herbert's radio, and consequently Mr. Herbert was not made aware that his radio was a bother to his coworkers.

38. Since the time he initiated action about the hostile work environment as discussed herein, Mr. Herbert continues to be assigned difficult and grunt work. For example, he has regularly been assigned to paint a large storage area, which is extremely hot

and lacks adequate ventilation. As a result, of the assignment, Mr. Herbert has suffered frequent headaches and other discomforts, including dizziness.

39. Mr. Herbert continues to be subjected to an ongoing hostile working environment at the hands of his supervisors.

## COUNT I: DISCRIMINATION BASED ON RACE

40. Mr. Herbert repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

41. The Architect of the Capitol passed Mr. Herbert over for a temporary promotion to act as "Point Man" during the 2008 Congressional Moves because of his race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Congressional Accountability Act.

42. As a result of the discriminatory conduct described above, Mr. Herbert did not receive the pay and benefits associated with the promotion, including bonuses and awards that are regularly associated with acting as a Point Man. Moreover, because acting as a Point Man is an important consideration for promotion, Mr. Herbert's promotion potential has suffered.

43. In addition to the foregoing direct and indirect economic damages, Mr. Herbert has suffered emotional pain and suffering.

## COUNT II: RETALIATION

44. Mr. Herbert repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

45. The Architect of the Capitol passed Mr. Herbert over for a temporary promotion to act as Point Man during the 2008 Congressional Moves in order to retaliate against

him, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Congressional Accountability Act, for his prior protected activity, namely complaining about Mr. Williams' discriminatory conduct at the Office of Compliance.

46. The retaliatory conduct described above resulted in materially adverse employment actions including but not limited to intimidating him from continuing his opposition to practices made unlawful by Title VII and the Congressional Accountability Act and depriving him of the pay, benefits, and additional promotion potential to which the promotion would have entitled him.

47. Mr. Herbert incurred damages, including but not limited to, a denied temporary promotion and damage to his promotion potential and eligibility for performance and other monetary awards. The Defendant's Retaliatory Conduct additionally caused Mr. Herbert to suffer emotional pain and suffering.

## COUNT III: HOSTILE ENVIRONMENT BASED ON RACE AND RETALIATION

48. Mr. Herbert repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

49. Based on the totality of the foregoing allegations, including the allegations added in this Second Amended Complaint, Mr. Herbert has been subjected to a continuous hostile environment that has adversely affected the terms and conditions of his employment by way of both discrete and non-discrete actions.

50. The hostile environment has been directed at Mr. Herbert as a result of his race and/or his protected equal employment opportunity activity.

51. As a result of the foregoing hostile environment, Mr. Herbert has suffered substantial

emotional pain and suffering.

## COUNT IV: DISCRIMINATION BASED ON RACE

52. Mr. Herbert repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

53. The Defendant disciplined Mr. Herbert for the incident regarding the radio when Mr. Herbert had politely and immediately complied with all requests from his leader concerning radio usage.

54. Despite the fact that Mr. Herbert's Caucasian colleague verbally assaulted and physically threatened him, no action was taken against the Caucasian colleague. Instead – motivated by racial animus – the Defendant issued Plaintiff unwarranted discipline in the form of a letter of reprimand.

55. Such discriminatory discipline was in violation of the Congressional Accountability Act.

56. As a result of the foregoing conduct, Mr. Herbert has suffered substantial emotional pain and suffering.

## COUNT V: ADDITIONAL ACTS OF RETALIATION

57. Mr. Herbert repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

58. The Defendant disciplined Mr. Herbert for the incident regarding the radio when Mr. Herbert had politely and immediately complied with all requests from his Work Leader concerning radio usage.

59. Despite the fact that Mr. Herbert's colleague verbally assaulted and physically threatened him, no action was taken against the colleague, who has not engaged in

activity protected by the Congressional Accountability Act against the Defendant. Instead – motivated by retaliatory animus – the Defendant issued Plaintiff unwarranted discipline in the form of a letter of reprimand.

60. Such retaliatory discipline, apart from being an aspect of Mr. Herbert's hostile work environment, was actionable separately under the Congressional Accountability Act.

61. As a result of the foregoing conduct, Mr. Herbert has suffered substantial emotional pain and suffering.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act and the Civil Rights statutes made applicable to the Architect of the Capitol therein; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying Plaintiff any monetary damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff